# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

JACQUELINE MEEKINS,

     *Plaintiff,*

v.                           Case No.  1:17cv56-MW/GRJ

T-MOBILE USA, INC.,

     *Defendant.*

_____/

## ORDER GRANTING DEFENDANT'S MOTION
## TO COMPEL ARBITRATION

This Court has considered, without hearing, Defendant T-Mobile USA, Inc.'s motion to compel arbitration of Plaintiff Jacqueline Meekins's claims. ECF No. 13. For the reasons articulated below, the motion is **GRANTED**.

### I.     Factual Background[1]

This dispute arises from a distinctly modern problem—the incessant pinging, vibrating, and beeps that the ubiquitous cell phone emits. In 1999, Ms. Meekins purchased a cell phone from T-Mobile and entered into a Service Agreement with the telecommunications behemoth. ECF No. 18 at 2. In 2013—

---

[1] The facts upon which this Order is based are not in dispute. This Court acknowledges that if facts were in dispute, an evidentiary hearing would be appropriate. *See Multi-Fin. Secs. Corp. v. King*, 386 F.3d 1364, 1368 (11th Cir. 2004) (finding an evidentiary hearing unnecessary "because the underlying factual circumstances are undisputed"). *See also Tandem Health Care of St. Petersburg, Inc. v. Whitney*, 897 So. 2d 531, 532–33 (Fla. 2d. DCA 2005) (listing state cases "in which the trial court can determine the existence of an agreement to arbitrate without conducting an evidentiary hearing").

apparently ready to supplant her venerable 14 year-old device—Ms. Meekins bought a replacement phone. *Id*. In December 2014, Ms. Meekins acquired a new phone from T-Mobile. *Id*. at 3. At this time, she signed a Service Agreement. *Id*. The Service Agreement states that "[b]y signing this form or activating or using T-Mobile service, I acknowledge and agree that: . . . Activation or use of T-Mobile service is your agreement to T-Mobile's Terms and Conditions and any terms specific to your rate plan."[2] ECF No. 13-1, Ex. 2.

During both purchases that she made in the twenty-first century, Ms. Meekins claims to have not received T-Mobile's Terms and Conditions, a label that the new telephone was contained in, nor an arbitration agreement. ECF No. 18, at 3. This apparent lack of document-sharing happened because a T-Mobile representative removed the new cell phone from its packaging before transferring information from the old phone to the new phone. *Id*. at 2–3. Nevertheless, Ms. Meekins admits to executing a Service Agreement in December 2014. ECF No. 18-1, at ¶ 6.

In April 2016, the texting began. Ms. Meekins alleges that T-Mobile sent a text message on or about April 20, 2016 regarding outstanding debt she had

---

[2] This Court acknowledges the grammatical inconsistency contained in the Service Agreement; in particular, the seemingly random shifts from the first-person point of view to the second-person point of view throughout the document. This Court notes that the subject of the Agreement is clearly the consumer who is agreeing to T-Mobile's terms. Therefore, it does not strain credulity to assume that the "I" and "your" refers to the same person—the consumer, Ms. Meekins.

with T-Mobile. ECF No. 1, at 4. She requested the texts stop. *Id*. The texting
continued through August, numbering at least 20 individual messages. *Id*. at
4–5. Ms. Meekins filed suit under the Telephone Consumer Protection Act and
the Florida Consumer Collection Practices Act, alleging emotional distress,
anxiety, inconvenience, frustration, among other injuries. *Id*. at 5–6. T-Mobile
moves to compel arbitration under 9 U.S.C. §§ 3–4, basing its motion on T-
Mobile's Terms and Conditions that require arbitration of disputes. ECF No.
13, at 1.

## II.    Legal Analysis

The crux of this dispute is whether the Service Agreement from Ms.
Meekins's December 2014 purchase of a cell phone created an enforceable
arbitration agreement. It does.

"[T]he first task of a court asked to compel arbitration of a dispute is to
determine whether the parties agreed to arbitrate that dispute." *Mitsubishi
Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626 (1985). It is
state contract law, as the Eleventh Circuit has repeatedly held, that "governs
the issue of the existence of an agreement to arbitrate." *Bazemore v. Jefferson
Capital Sys., LLC*, 827 F.3d 1325, 1330 (11th Cir. 2016).  As Ms. Meekins
correctly points out, an enforceable contract under Florida law must contain
an offer, acceptance, consideration, and a "sufficient specification of the
essential terms." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir.

2009); *see also* ECF No. 18, at 4. Ms. Meekins also accurately acknowledges that, in Florida, the party moving for arbitration—T-Mobile, in this case—shoulders the burden of showing that a valid and enforceable arbitration agreement exists. *See Shearson, Lehman, Hutton, Inc. v. Lifshutz*, 595 So. 2d 996, 997 (Fla. 4th DCA 1992) (explaining that the party moving to compel arbitration has "the burden of establishing that an enforceable written agreement to arbitrate existed between the parties").

Here, T-Mobile has produced a Service Agreement that Ms. Meekins executed in December 2014. ECF No. 13-1, Ex. 2. Ms. Meekins admits to signing the agreement. ECF No. 18, at 3; *see also* ECF No. 18-1, at ¶ 6. This document supports T-Mobile's motion in two ways. First, the Service Agreement explicitly declares—in capital letters, no less—that "T-MOBILE REQUIRES ARBITRATION OF DISPUTES UNLESS I PREVIOUSLY OPTED OUT PURSUANT TO T-MOBILE'S TERMS AND CONDITIONS." ECF No. 13-1, Ex. 2.

Second, the Agreement states that "[a]ctivation or use of T-Mobile service is your agreement to T-Mobile's Terms and Conditions and any terms specific to your rate plan." *Id.* Both of these relevant terms in the Service Agreement follow a bolded statement located at the beginning of the document: "By signing this form or using T-Mobile service, I acknowledge and agree that: . . ." *Id.* The signed Service Agreement demonstrates both the consumer's

4

acknowledgment of *and agreement to* T-Mobile's Terms and Conditions as well as the requirement to arbitrate disputes. Accordingly, a valid and enforceable contract under Florida law exists. The document evidences an offer, the signature and Ms. Meekins's cell-phone usage demonstrates acceptance, the exchange of money and cell-phone service shows consideration—all with the essential terms of the Agreement specifically detailed. Simply put, T-Mobile has shouldered its burden of production in showing the existence of an agreement.

In response, Ms. Meekins argues that the Service Agreement's arbitration language is merely a statement that T-Mobile requires arbitration rather than a binding arbitration agreement. *See* ECF No. 18, at 6 (describing the Service Agreement as "not alert[ing] her to an arbitration agreement but instead states that T-Mobile requires arbitration of disputes unless Plaintiff had previously opted out").

This argument is not persuasive. "Under normal circumstances," the Eleventh Circuit has held, "an arbitration *provision* within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration." *Chastain v. Robinson-Humphrey Co., Inc.*, 957 F.2d 851, 854 (11th Cir. 1992), *abrogation on other grounds recognized by Larsen v. Citibank*, 2017 WL 4250074 (11th Cir. Sept. 26, 2017) (emphasis added). There are no indications that Ms. Meekins's signed

the Service Agreement under abnormal circumstances. Further, the Service Agreement unequivocally contains an arbitration *provision*, which all binding precedent requires to send a dispute to arbitration. The document does not need to spell out an "alert" to an arbitration agreement, as Ms. Meekins contends. ECF No. 18, at 6. Instead, the document need only contain a provision—such as one "REQUIR[ING] ARBITRATION OF DISPUTES," ECF No. 13-1, Ex. 2—to successfully send a dispute to arbitration.

Ms. Meekins also argues that the Service Agreement *alone* did not create an arbitration agreement because T-Mobile did not attach its Terms and Conditions to the agreement. *See* ECF No. 18, at 8–9. Assuming arguendo that the arbitration provision in the Service Agreement did not create an arbitration agreement, her argument still fails in the face of longstanding precedent. An agreement can incorporate by reference another document, which, in turn, binds the parties. "It is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *Int'l Fidelity Ins. Co. v. Americaribe-Moriarty JV*, 681 F. App'x 771, 775 (11th Cir. 2017) (quoting *OBS Co. v. Pace Constr. Corp.*, 558 So. 2d 404, 406 (Fla. 1990)). T-Mobile's Service Agreement referenced the Terms and Conditions with sufficient particularity and should, therefore, "be interpreted as part of the writing." *Id.* And, because the

incorporated Terms and Conditions detail the requirements for arbitration, T-Mobile's motion to compel must be granted. *See* ECF No. 13-1, Exs. 1 & 3.

Ms. Meekins next offers several arguments concerning the provisions of the arbitration agreement in order to avoid arbitration with T-Mobile. She argues that the arbitration agreement is void as to public policy because it is an illusory agreement, it limits Ms. Meekins's remedies, and it is both procedurally and substantively unconscionable. *See* ECF No. 18, at 9–21. Although Ms. Meekins's arguments highlight some of the weaknesses in policy rationales of arbitration agreements entered *en masse* from large entities like T-Mobile, her arguments are not persuasive under existing law.

First, the arbitration agreement is not illusory. In Florida, a contract is illusory if "one party can change or end the contract at its own option while the other party is still bound to its performance." *Diverse Elements, Inc. v. Ecommerce, Inc.*, 5 F. Supp. 3d 1378, 1382 (S.D. Fla. 2014) (citing *Feldkamp v. Long Bay Partners, LLC*, 773 F. Supp. 2d 1273, 1284 (M.D. Fla. 2011)). If one of the parties to the contract reserves modification rights, "that reservation must be subject to certain limitations," such as reasonable notice. *Id.*

Here, T-Mobile's arbitration agreement—contained in the Terms and Conditions and Service Agreement—is not illusory because T-Mobile cannot unilaterally change the agreement without notice to the consumer. That is, T-Mobile's contract modification is "subject to certain limitations" and not an

unlimited and unchecked power indicative of an illusory contract. *Id.* Specifically, the Terms and Conditions describe how T-Mobile must provide 30 days' notice to consumers if T-Mobile seeks to modify the document; consumers then have 14 days to end T-Mobile's service. ECF No. 13-1, Exs. 1 & 3, at ¶ 6.

Ms. Meekins's reliance on the termination provision in the Terms and Conditions misses the mark because that provision is primarily focused on consumers' breaches of the contract. For example, T-Mobile may unilaterally terminate cell-phone service if a consumer "(a) breaches the Agreement; (b) incurs Charges greater than any billing or credit limitation . . . (g) misuses [the] Service or Device . . . [and] (h) uses [the] Service or Device in a manner that is excessive, unusually burdensome, or unprofitable to us." *Id.* at ¶ 19. Even if the termination provision were apposite, T-Mobile's termination would impact the entire agreement and Ms. Meekins would not be "still bound to its performance." *Diverse Elements, Inc.*, 5 F. Supp 3d., at 1382. If she were bound to the agreement somehow—a circumstance this provision does not suggest— an illusory contract may exist. But Ms. Meekins does not allege any facts indicating that T-Mobile has terminated the contract while she remains bound to it. In short, then, the agreement is not illusory.

Second, the agreement to arbitrate does not seem to limit Ms. Meekins's remedies. Concerning the shortening of the statute of limitations that the agreement contains and Ms. Meekins challenges, "arbitration clauses limiting

the applicable statute of limitations are repeatedly upheld by Florida courts."

*Pilitz v. Bluegreen Corp.*, 2011 WL 3359641, at *6 (M.D. Fla. Aug. 4, 2011).

Additionally, this Court observes that in the Terms and Conditions, the

arbitrator is permitted to "AWARD THE SAME DAMAGES AND RELIEF AS

A COURT (INCLUDING ATTORNEYS' FEES)." ECF No. 13-1, Exs. 1 & 3, at

¶ 2. Any limitations on damages or monetary relief are explicitly barred if they

are "PROHIBITED BY LAW." *Id*. at ¶ 24.

Before further engaging in substantive analyses of the alleged

restrictions on damages, however, this Court notes that because the dispute is

to be arbitrated, "an arbitrator and not a court should decide the validity of the

remedial restriction provisions." *Anders v. Hometown Mortg. Servs., Inc.*, 346

F.3d 1024, 1032 (11th Cir. 2003). As the Supreme Court has held, "unless the

challenge is to the arbitration clause itself, the issue of the contract's validity

is considered by the arbitrator in the first instance." *Buckeye Check Cashing,

Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006). Here, because Ms. Meekins is

challenging provisions related to damages in T-Mobile's Terms and Conditions

and Service Agreement that are beyond their arbitration clauses, "the

arbitrator in the first instance" is the better-suited individual to address this

claim. *Id*. at 446.

Finally, the arbitration agreement is neither procedurally nor

substantively unconscionable. Under Florida law, "[a]n agreement to arbitrate

will be deemed unenforceable on grounds of unconscionability when it is both procedurally and substantively unconscionable." *Fla. Holdings III, LLC v. Duerst*, 198 So. 3d 834, 838 (Fla. 2d DCA 2016) (citations omitted); *see also Basulto v. Hialeah Automotive*, 141 So. 3d 1145, 1161 (Fla. 2014).

Courts consider four factors to determine whether an arbitration agreement is procedurally unconscionable under Florida law: (1) the manner in which the contract was entered; (2) the relative bargaining power of the parties and whether the complaining party had a meaningful choice at the time of the contract's formation; (3) whether the terms were on a "take-it-or-leave-it" basis; and (4) the complaining party's ability and opportunity to understand the disputed terms of the contract. *See Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1135 (11th Cir. 2010) (outlining these four factors).

Here, none of the four factors manifest themselves from the facts alleged. There is no claim that Ms. Meekins "was unduly pressured or harassed to enter into the Service Agreement." *Owings v. T-Mobile USA, Inc.*, 978 F. Supp. 2d 1215, 1224 (M.D. Fla. 2013). Additionally, the Terms and Conditions—which, as described above, were incorporated by reference into the Service Agreement—provided an opt-out provision to consumers to settle disputes in court, instead of through arbitration. *See* ECF No. 13-1, Exs. 1 & 3, at ¶ 2. Ms. Meekins argues that because she only received the Service Agreement from T-Mobile, she "never opted in, [and so] she never had the opportunity to opt out."

ECF No. 18, at 17. Ms. Meekins, however, agreed to the Terms and Conditions when she executed the Service Agreement, including the opt-out provision. Although Ms. Meekins alleges she never saw the Terms and Conditions, her acknowledgement that "the service agreement states that Plaintiff is required to arbitrate unless she opted out previously" indicates she was aware that a consumer *could* opt out of arbitration. *Id*. This provision in the Service Agreement provided Ms. Meekins with, at minimum, notice of an opt-out provision in the Terms and Conditions. She could have, for example, sought out the specific terms of the incorporated Terms and Conditions to see precisely what consumers could opt out of, as the Service Agreement specified.

Further, the Service Agreement that Ms. Meekins executed contained no "take-it-or-leave it" provision. Having been alerted to the existence of an opt-out provision in the Service Agreement, she could have inquired into the provision further and then withdrawn from the arbitration requirements. Finally, both the Service Agreement and Terms and Conditions were written in organized and labeled sections that contained bold type and capitalizations for emphasis. Although these documents are about as entrancing to read as watching an elderly cat doze in front of a plain wall, no "important terms were 'hidden in a maze of fine print and minimized by deceptive sales practices.'" *Powertel, Inc. v. Bexley*, 743 So. 2d 570, 574 (Fla. 1st DCA 1999) (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965)).

11

"[T]here is ample support in existing case law requiring that *both* prongs of unconscionability must be established by a proper showing." *Basulto*, 141 So. 3d, at 1158–59 (emphasis added). Because Ms. Meekins is unable to demonstrate that the agreement is procedurally unconscionable, this Court does not need to engage in an analysis to determine whether the agreement is substantively unconscionable.

In conclusion, Ms. Meekins unequivocally entered into a valid and enforceable arbitration agreement with T-Mobile by signing the Service Agreement in December 2014. Because that Agreement is not illusory, does not seem to limit remedies, is not unconscionable, and both incorporated by reference T-Mobile's Terms and Conditions, including an arbitration clause, *and* explicitly required arbitration, T-Mobile's motion to compel arbitration is **GRANTED and the case is DISMISSED WITHOUT PREJUDICE**.  The Clerk shall close the file.

If Plaintiff intends to pursue this matter then Plaintiff must arbitrate. This Court will not maintain the stay but exercises its discretion to dismiss without prejudice.  The parties can move to reopen the file if a party needs to move to confirm the arbitration award or seek other relief.

**SO ORDERED on October 18, 2017.**

**s/Mark E. Walker**
**United States District Judge**